IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | : | Chapter 13 |
| | : | |
| Dennis Eugene Fickel & | : | Bankruptcy No.: 1-07-bk-02822 RNO |
| Colleen Marie Fickel | : | |
| | : | |
| Debtors | : | |
| and | : | Chapter 13 |
| | : | |
| In Re: | : | Bankruptcy No.: 1-07-bk-02824 RNO |
| | : | |
| Douglas Wayne Fickel Sr. & | : | |
| Pamela Elaine Fickel | : | |
| Debtors | : | |

****************************************************************************

| | | |
|---|---|---|
| Members First Federal Credit Union | : | |
| | : | |
| Movant | : | |
| | : | |
| vs. | : | Objection to Confirmation of Chapter 13 |
| | : | Plans Pursuant to § 1325(a)(1)&(3) |
| Dennis Eugene Fickel, Colleen Marie | : | |
| Fickel, Douglas Wayne Fickel Sr. and | : | |
| Pamela Elaine Fickel | : | |
| Respondents | : | |

# **OPINION**[1]

Presently pending before the Court is Members First Federal Credit Union's (Members First) bad faith objections to the confirmation of two Chapter 13 Plans; the Plan of Dennis and Colleen Fickle and the Plan of Douglas and Pamela Fickel. Dennis, Colleen, Douglas and Pamela are the four sole members of Kitchen Happens, LLC, a Pennsylvania limited liability company ("LLC") which ceased operations in late July 2007. The objections stem from various loans made by Members First in connection with the start up and ongoing business of the LLC;

---

[1]Drafted with the assistance of law clerk, Kathryn F. Evans, Esquire.

-1-

therefore, at trial, the parties agreed to consolidate the record for the two cases. For the reasons stated below, the objections to confirmation in each case are overruled.

**Jurisdiction**

The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

**Facts**

In early summer 2005, brothers, Dennis and Douglas Fickel, and their wives, Colleen and Pamela Fickel (collectively the "Debtors"), decided to open a franchise branch of Kitchen Happens. Kitchen Happens was a "make and take" restaurant where working people or families would go and prepare a week's worth of family style dinners in one evening; the dinners can be taken home in refrigerated containers and used when needed. In 2005, to actualize their business plans, the Debtors cashed in numerous stocks, bonds and mutual funds; they also liquidated 401K retirement plans. The Debtors also approached various lending institutions, including Members First, to help secure funds to purchase a Kitchen Happens franchise. Ultimately, Pamela Fickel testified they raised approximately $600,000.00 for that purpose.

Mark Ritter, the Assistant Vice President of Business Lending at Members First, informed the Debtors that in order to qualify for a business loan, they would also need to take out home equity loans on the couples' respective residences. On August 3, 2005, Pamela and Douglas took out a home equity loan of $135,000.00 and on August 5, 2005, Colleen and Dennis took out a home equity loan of $93,400.00. The Debtors also took out two business loans; one for $175,000.00 in December 2005, and one in August 2006 for $25,000.00. Both business loans were secured by the LLC's personal property and fixtures, as well as the Debtors' personal

guarantees. At some point in early 2007, the Main Dish, the franchiser for Kitchen Happens, went out of business. This required the Debtors to chose between selling the business or coming up with their own menus, selections, and recipes. The Debtors decided that they would not be able to maintain the business and informed Mark Ritter of Members First about their financial troubles. Mark Ritter referred the Debtors to Mark Charles and Associates, a business broker firm, so they might obtain assistance in marketing and selling the business. Two potential purchasers were identified but no sale was ever consummated. The business closed its doors on July 31, 2007; at that time, the Debtors donated all the remaining perishable food to local food banks. They also cleaned the leased business premises and handed the key over to the landlord who informed them the locks would be changed. The Debtors testified none of them received a paycheck from the business the entire time it was operating.

On August 24, 2007, Members First confessed judgment against Kitchen Happens and froze the bank accounts held by the Debtors at Members First, despite the fact that none of the loans were yet in arrears. On September 8 2007, Dennis and Collen Fickel filed for Chapter 13 relief. On September 9, 2007, Douglas and Pamela Fickel filed for Chapter 13 relief.

**Analysis**

When a creditor objects to the confirmation of a Chapter 13 plan, all the requirements of 11 U.S.C. § 1325[2] must be met. See *In re Haas*, 203 B.R. 573, 576 (Bankr. E.D. Pa. 1996) citing *In re Szostek,* 886 F.2d 1405, 1412 (3d Cir. 1989) (the requirements of § 1325 are not mandatory unless a creditor objects to confirmation). Members First has objected to the Debtors' Plans as

---

[2] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

-3-

Case 1:07-bk-02824-RNO    Doc 42    Filed 04/10/08    Entered 04/10/08 13:30:23    Desc
                          Main Document      Page 3 of 12

being filed in bad faith, in violation of § 1325(a)(1) and (3).³ "The creditor has the initial burden of articulating a clear and cognizable objection." *In re Fricker*, 116 B.R. 431, 438 (Bankr. E.D. Pa. 1990) see also *In re Price*, Case No. 1:06-bk-01457-MDF (Bankr. M.D. Pa. filed March 6, 2008). Once a creditor meets its initial burden, the burden shifts to the Debtors to persuade the court to overrule the objection and confirm their plan. *In re Jensen*, 369 B.R. 210, 234 (Bankr. E.D. Pa. 2007).

In support of its objection, Members First offered evidence that the Debtors commingled LLC and personal assets, distributed $4,600.00 of corporate property and gave away sixteen mini refrigerators belonging to the LLC. Members First also alleges that the Debtors failed to list the gifts in their Statement of Financial Affairs filed in their cases. I find this sufficient to shift the burden to the Debtors to prove their Plans were filed in good faith and should be confirmed.

**A. The Good Faith Standard per § 1325(a)(3)**

The Third Circuit has not defined the term "good faith" for purposes of § 1325(a)(3) objections, nor has it established specific factors in making a § 1325(a)(3) good faith inquiry. *In re Jensen,* 369 B.R. 210, 233 (Bankr. E.D. Pa. 2007). However, the Third Circuit has adopted a fact intensive totality of the circumstances analysis applicable to bad faith dismissals in the context of § 1307 motions to dismiss. *In re Lilley,* 91 F.3d 491, 496 (3d Cir. 1996); *In re Myers,* 491 F.3d 120, 125 (3d Cir. 2007). My colleague, Judge France, recently held that the 2005

---

³ 11 U.S.C. § 1325(a)(1):
Except as provided in subsection (b), the court shall confirm a plan if–
    (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title; . . .
    (3) the plan has been proposed in good faith and not by any means forbidden by law; . . .

-4-

amendments to the Bankruptcy Code, which added § 1325(a)(7)[4], implicitly incorporate the § 1307 dismissal standard into a § 1325 good faith objection analysis. *Citifinancial v. Price (In re Price)*, Case No. 1:06-bk-01457-MDF (Bankr. M.D. Pa. filed March 6, 2008). As such, I will use the totality of the circumstances test for purposes of deciding the instant good faith objection.

The Third Circuit recently reiterated the totality of the circumstances standard and held:

> The Bankruptcy Court looks to the totality of the circumstances to determine bad faith, and may consider a wide range of factors, including, "the nature of the debt . . .; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors."

*In re Myers,* 491 F.3d 120,125 (3d Cir. 2007) citing *In re Lilley,* 91 F.3d 491, 496 (3d Cir. 1996). The Debtors must establish the plan was filed in good faith by a preponderance of the evidence. *In re Norwood*, 178 B.R. 683, 687 (Bankr. E.D. Pa. 1995).

### 1. Nature of the Debtors' Debt and How it Arose

Dennis and Colleen Fickels' schedules report $177,166.08 of secured debt, and $331,589.96 of unsecured debt, including $249,406.53 of disputed corporate debt. Douglas and Pamela Fickels' schedules report $319,635.00 in secured debt and $272,250.51 of unsecured debt, including $237,322.48 of disputed corporate debt.

Prior to filing for bankruptcy, Pamela and Douglas Fickel repaid $135,000.00 of the loan through refinancing their home; another portion of the refinance proceeds were used to make their home handicapped accessible for their disabled child. Dennis and Colleen Fickle propose

---

[4]Section 1325(a)(7): ". . . the action of the debtor in filing the petition was in good faith; . . .".

to repay their home equity loan through their Chapter 13 Plan. The remaining unsecured portion of the Members First debt, $188,757.00, will be paid pro rata with the other unsecured creditors. The Court takes judicial notice of the fact there have been no allegations of eve-of-bankruptcy or luxury purchases by the Debtors. The nature of the Debtors' debt is primarily business debt that arose out of the failure of their LLC. I do not ascribe great weight to this factor but find that it slightly favors confirmation of the Plans.

### 2. Timing of the Petition and Debtors' Motive in Filing

When examining a debtor's motives in filing bankruptcy, "[b]ad faith may be found when the debtor has a frivolous, noneconomic motive for filing a bankruptcy petition, when there is a sinister or unworthy purpose, or when there is an abuse of the judicial process." *In re Shula,* 280 B.R. 903, 905 (Bankr. S.D. Ala. 2001). The Debtors' cases were filed on September 8, 2007, and September 9, 2007, approximately two months after Kitchen Happens closed and two weeks after Members First confessed judgment. Pamela Fickel testified on behalf of the Debtors that she and the other Debtors' motivation for filing was the simple inability to repay their debt to Members First. She testified that all four of the Fickels had put substantially all their liquid assets into the business and when it failed they were unable to pay their debts. Further, there was evidence on the record that the filing of the case was precipitated by the failure of the business and was a last resort option. For example, Pamela Fickel testified that she and Douglas Fickel refinanced their mortgage with Members First in an attempt to reduce the debt but, ultimately, the four Debtors were forced to file bankruptcy. The Court does not find that the Debtors' motives were sinister or an attempt to abuse the judicial process; thus, this factor weighs in favor of confirmation.

-6-

### 3. How the Debtors' Actions Affected Creditors and Debtors' Treatment of Creditors Before and After Filing

Members First asserts that prior to the filing, the Debtors gave away business assets and collateral securing the LLC's business loans. Members First bases its objection primarily on a list of allegedly missing assets prepared by Mark Ritter and introduced as Creditor Exhibit Number 23. Mark Ritter, visited and photographed the former business premises on November 17, 2007, and believed at the time of the visit that there were business assets missing from the premises. At that time, Mr. Ritter did not have a list of assets previously owned by the company to confirm or allay his suspicions. He asked a broker from Mark Charles and Associates to fax him a list of the business assets which had been used in the Fickels' efforts to market the LLC for sale. The list was approximately half a page in length with twenty-three categories ranging from the broad category of kitchenwares to specific items such as stainless steel ice drains and an ice maker. Mark Ritter received that list on December 11, 2007. Upon receipt, Mr. Ritter made "X"s next to items on the list he remembered being absent from the premises during his November 17, 2007, visit. On cross examination, Mr Ritter admitted the list was partially inaccurate given the fact he listed an ice maker worth $2,2712.25 as a missing asset when, in fact, it was on the premises. Additionally, the Court was troubled by the fact that Mr. Ritter was unable to break down specifically what kinds of items were included in the category of missing "kitchenwares" worth $33,451.66, and what "furnishings" worth $3,000.00 were missing. The equivocal nature of the evidence offered does not allow the Court to find that collateral assets were removed from the premises by the Debtors.

Case 1:07-bk-02824-RNO    Doc 42    Filed 04/10/08    Entered 04/10/08 13:30:23    Desc
Main Document    Page 7 of 12

The Debtors counter that they vacated the premises on July 31, 2007, and did not return until January 21, 2008, in preparation for this hearing. The Debtors explained the reason many of the drawers and cupboards were empty during Mr. Ritters's November 17, 2007 visit was because they were normally stocked with perishable foodstuffs which had been donated to food banks. Pamela Fickel testified that on the last day of business, they cleaned the work space, left the convection oven, drawers of silverware and cutlery, several large carts, shelving units, refrigerator units, an ice machine, some non-perishable foodstuffs and other miscellaneous kitchen goods. The Debtors gave the keys to the landlord and left on July 31, 2007. The Landlord subsequently changed the locks precluding them from reentering the building. Pamela Fickel testified that when she reentered the premises in January, there were some missing items including two utility carts, some spices, knives, a few files and some trash cans but that, to her knowledge, only the landlord had had access to the premises. The Court generally found Ms. Fickel to be a credible witness. Further, the Court is wary to rely on a list of allegedly missing assets proffered by Members First given that it was unable to articulate with any specificity exactly what constituted some of the vague categories like "kitchenwares" supposedly worth over $33,000.00. The Debtors introduced into evidence photographs showing drawers containing what appeared to be a significant number of kitchen and food preparation utensils still on the premises.

The Court also finds significance in the fact that, prior to filing for bankruptcy, the Debtors consulted with Mark Ritter to advise him of their financial circumstances. The Debtors worked with the business brokerage firm that Ritter recommended and tried to sell the business. Ultimately, when their efforts were unsuccessful, they informed Members First of their

predicament and Members First then froze the Debtors' bank accounts despite the fact the loans were not yet in default; judgments were confessed against them shortly thereafter.

The Debtors admitted the bank's collateral included the donated food. They also admitted giving sixteen mini-fridges to friends with college-age children; also $4,600.00 in cash was disbursed to employees who had volunteered extra hours in the business. Colleen and Dennis Fickel have since amended their Statement of Financial Affairs to include the gifted mini fridges. Furthermore, although the Court does not condone these transfers, even ". . . a fraudulent transfer is not per se bad faith so as to make an otherwise confirmable plan unconfirmable." *In re Osborn,* 346 B.R. 204, 206 (Bankr. N.D. Cal. 2006).

The Debtors' treatment of Members First after the filing of the bankruptcy and in their proposed Chapter 13 Plans does not intimate any discrimination or prejudicial treatment of Members First. Members First will maintain their interest in Colleen and Dennis Fickel's home and be paid regular monthly payments. Further, Members First's remaining unsecured business debt will be paid pro rata in both Debtors' Plans with all the other unsecured creditors. When balancing the previously undisclosed pre-petition transfers made by the Debtors against the great efforts the Debtors took to include Members First in their financial predicaments I find this factor weighs neither in favor nor against confirmation of Debtors' Plans.

### 4. Whether Debtors Were Forthcoming with the Bankruptcy Court and Creditors

Members First argues the Debtors wrongfully commingled business and personal assets. In support of this theory, they produced several checks written on the LLC's account to Dell Financial in payment for a computer and printer and several checks to a Sears credit card owned personally by Dennis Fickel. Pamela Fickel testified that the Sears card was used to make

-9-

Case 1:07-bk-02824-RNO    Doc 42    Filed 04/10/08    Entered 04/10/08 13:30:23    Desc
Main Document    Page 9 of 12

purchases for the business including a convection oven which still remains at the business premises and, therefore, I do not find any bad faith with regard to the payments by the LLC to Sears. Members First contends the computer and other assets should not be considered assets of the Debtors personally but rather business assets. Members Fist then asks the Court to award them the value of the commingled assets. The Court is considering objections to confirmation, and because Members First cites no underlying authority to grant such extraordinary relief, the request is denied.

The Debtors counter that they were completely forthcoming with the Court and their creditors. They assert the convection oven was purchased with the Dennis Fickel's personal Sears Card and was not removed from the LLC's former premises. Counsel asserts the omission of the gifted sixteen refrigerators was her error and not the Debtors and has since filed an amendment to one of the Statement of Financial Affairs. Further, the Debtors argue that the value of the items was negligible and that Debtors had no legal motivation to omit the transfer of these assets which are of little value. The Debtors cite as authority, *In re Roberts,* for the proposition that omissions from the schedules do not constitute bad faith when the inaccuracies provide no advantage to the debtor. 339 B.R. 807, 813 (Bankr. M.D. Ga. 2006). The Court agrees with the Debtors. I find the failure to list the transfer of the sixteen refrigerators to be an oversight of counsel which will not be held against the Debtors for purposes of considering whether the Debtors were forthcoming with the Court. On balance, while the Court believes the Debtors have made mistakes, overall they have been forthcoming with the Court and their creditors.

-10-

### 5. Whether Debtors Unfairly Manipulated the Bankruptcy Code or Abused the Spirit of Chapter 13

"[T]he basic purpose and spirit of Chapter 13 is rehabilitation and repayment of debt by periodic payments made to a trustee under bankruptcy court protection, with the aim of providing honest, unfortunate and genuinely financially distressed debtors an opportunity to obtain a fresh start." *In re Price*, Case No. 1:06-bk-01457-MDF (Bankr. M.D. Pa. filed March 6, 2008) citing *In re McGovern,* 297 B.R. 650, 658 (S.D. Fla. 2003). It appears to the Court that the Debtors are all genuinely financially distressed debtors who invested almost all of their liquid assets into a business which ultimately failed causing them considerable financial loss. The Court does not find the Debtors are seeking to manipulate the Bankruptcy Code. Further, "[t]o find lack of good faith, there should be a showing of serious misconduct or abuse on the part of the debtors." *Matter of Verdunn*, 160 B.R. 682, 688 (Bankr. M.D. Fla. 1993). The Court cannot find the distribution of $4,600.00 to former employees and the gift of sixteen mini refrigerators rises to the level of serious misconduct or abuse on the part of the Debtors. Therefore, I find this factor weighs in favor of confirming the Plans.

**Conclusion**

The Court understands Members First consternation at the losses it may sustain on its loans. However, a lender obtaining a bad result does not equate to the debtors having acted in bad faith. After considering the totality of the circumstances presented herein, I find that the Debtors have met their burden on the issue of good faith, and therefore, the objections to confirmation will be overruled.

-11-

An Order consistent with the foregoing opinion will be entered.

Date:   April 10, 2008

_____
Robert N. Opel, II, Bankruptcy Judge
                                                                        (BI)

This opinion is electronically signed and filed on the same date.

-12-